UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
UNITED STATES OF AMERICA,

                                        18-cr-845 (PKC)


                -against-

                                        OPINION
                                        AND ORDER


JAMES WOODSON,

                        Defendant.
----------------------------------------------------------x

CASTEL, U.S.D.J.:

            Defendant James Woodson, ably represented by counsel, has filed an emergency

motion for a sentence reduction pursuant to the First Step Act of 2018, 18 U.S.C.

§ 3582(c)(1)(A), asserting "extraordinary and compelling reasons."  (Doc 58.)  The government

acknowledges that Woodson has now satisfied the statutory exhaustion requirement because

more than 30 days have expired since his application to the Bureau of Prisons ("BOP").  (Gov't

Letter of Apr. 30, 2020 at 2-3.)  Against the backdrop of the COVID-19 pandemic presently

striking the Nation and the City of New York, Woodson argues that he has an enhanced risk of

contracting COVID-19 at the Metropolitan Correctional Center ("MCC") where he is currently

incarcerated and, were he to contract the disease, his preexisting conditions would make it life-

threatening to him.

            The government has opposed the application.  The Court heard argument from the

parties on May 1, 2020.  The Court also heard argument on April 1, 2020 on Woodson's prior

application for similar relief.  (Apr. 1, 2020 Hr'g Tr. (Doc 56).)  The Court denied Woodson's

previous motion for failure to exhaust.  United States v. Woodson, No. 18-cr-845, 2020 WL

1673253 (S.D.N.Y. Apr. 6, 2020).  For reasons explained, Woodson's present application will also be denied.

DISCUSSION

Section 3582(c)(1)(A) of title 18 provides that "upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier," a court may reduce such defendant's sentence if it finds that "extraordinary and compelling circumstances warrant such a reduction," and that "such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission."  18 U.S.C.§ 3582(c)(1)(A)(i).  The Court must also consider the "factors set forth in section 3553(a) to the extent that they are applicable."  Id. § 3582(c)(1)(A).

The United States Sentencing Commission is required by statute to promulgate "general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18 [] describ[ing] what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."  28 U.S.C. § 994(t).  See United States v. Butler, No. 19 Cr. 834-10 (PAE), 2020 WL 1689778, at *1 (S.D.N.Y. Apr. 7, 2020); United States v. Ebbers, ___ F. Supp. 3d ___,  No. 02 Cr. 1144-3 (VEC), 2020 WL 91399, at *4  (S.D.N.Y. Jan. 8, 2020). The Commission's policy statement and its corresponding commentary on section 3582(c)(1)(A) state that a court may reduce a sentence for "extraordinary and compelling reasons," including where the defendant is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care

within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13(1)(A) & cmt. n.1(A)(ii).  The defendant must also not be a danger to the community and the reduction must be consistent with the Commission's policy statement.  Id. § 1B1.13(2)–(3).

Woodson pled guilty to one count of healthcare fraud in violation of 18 U.S.C. §§ 1347 and 2.  (Feb. 22, 2019 Plea Tr. (Doc 17).)  Woodson, a recipient of Medicare and Veteran's Administration ("VA") benefits, fraudulently obtained and filled hundreds of prescriptions for antiretroviral drugs and medications for an autoimmune deficiency. Woodson received an excess supply of these medications using dozens of different pharmacies and doctors, filling the same prescriptions for medications through Medicare Part D and the VA, and "plan-hopping" among Medicare plans.  Woodson then resold these drugs on the black market.  (Presentence Investigation Report ("PSR") ¶¶ 13-18, 20-21.)  Medicare paid approximately $815,502.39 for these excessive prescriptions that Woodson resold.  (Id. ¶ 19.)

Woodson faced a Sentencing Guidelines range of imprisonment of 27 to 33 months.  (PSR at 21.)  He had eleven prior convictions for non-violent crimes, including larceny. (Id. ¶¶ 40-51.)  On November 26, 2019, this Court sentenced Woodson to a below-Guidelines sentence of principally 1 year and 1 day imprisonment,[1] to be followed by 3 years of supervised release.  The Court further ordered Woodson to pay restitution in the amount of $815,502.39. (Nov. 26, 2019 Sentencing Tr. (Doc 41).)  The Court initially ordered Woodson to surrender to the BOP on January 14, 2020, but later extended that date, at Woodson's request, to February 4,

---

[1] By sentencing Woodson to a term that exceed one year by a single day, he became eligible to receive "good time" credit from the BOP.  18 U.S.C. § 3624(b).

2020, at or before 2:00pm.  (Memo Endorsement of Jan. 9, 2020 (Doc 43).)  He did not surrender

as required and on February 5, 2020, at approximately 11:42am, the Court issued a bench

warrant.  The warrant was never executed because Woodson surrendered later that day and

began serving his sentence on February 5, 2020 at the MCC, where he remains incarcerated.

With good conduct credit, Woodson is projected to be released on December 12, 2020.

        Woodson points to his recent success in overcoming addiction.  Woodson has an

addiction to crack cocaine and admitted to smoking crack one week before his presentence

interview.  (PSR ¶ 73.)  Without diminishing what he has accomplished, during the period from

June 2018 to April 2019, Woodson failed at least ten drug tests—testing positive for cocaine—

and missed more than seven counseling sessions.  (Apr. 24, 2019 Bail Review Hr'g Tr. (Doc 28)

at 3.)  Woodson was supervised by two Pretrial Services Officers, Carlos Ramirez and Jonathan

Lettieri, who both attended his bail review proceeding.  Despite his failures in both inpatient and

outpatient programs, through the efforts of his own lawyer and the pretrial services officers,

Woodson was given the opportunity to participate in a six-month program at Samaritan Daytop

Village.  Woodson had considerably more success in that program, which is commendable and

was known and considered at the time of his sentencing.  (Doc 41 at 8-9.)

        Woodson also relies on the risk factors that make him more susceptible to dire

consequences were he to become infected by the virus.  Diane Sommer, M.D. performed a

physical evaluation of Woodson on March 4, 2020.  Dr. Sommer's evaluation reflects that

Woodson has the following conditions: asthma, chronic viral hepatitis B, essential (primary)

hypertension, HIV asymptomatic (never had an HIV-related illness), hypothyroidism, and pain in

arm (unspecified).  With regard to asthma, her notes reflect: "Resp—no cough, no wheezing, no

shortness of breath, no night time symptoms, no symptoms with activity—rarely uses his

albuterol—no recent asthma flares."  At the time of his evaluation by Dr. Sommer, Woodson's

blood pressure was recorded at 139/92.

Robert Beaudouin, M.D. conducted a physical evaluation of Woodson on April 29,

2020.  Woodson reported a history of "ast[h]ma for past 2 years. States his asthma has been

recently exacerbated by stress. States the rescue inhaler is not enough to help him manage the

asth[m]a."  Dr. Beaudouin prescribed Mometasone Furoate 220 MCG/Inhaler for Woodson's

asthma.  At the time of his evaluation by Dr. Beaudouin, Woodson's blood pressure was 115/84.

He was administered the Wright Peak Flow test (measuring peak expiratory flow) and an $SAO_2$

test (measuring oxygen saturation levels) with no remarkable results noted.  As to Woodson's

pulmonary function, Dr. Beaudouin noted that he was "clear to auscultation" with no crackles,

rhonchi, or wheezing.

Woodson also suffers from anxiety and major depressive disorder.  (PSR ¶ 70.)

According to a study posted by the CDC, for the period March 1 through March

30, 2020, 89.3% of adults hospitalized with COVID-19 had one or more underlying conditions.

"The most commonly reported were hypertension (49.7%), obesity (48.3%), chronic lung disease

(34.6%), diabetes mellitus (28.3%), and cardiovascular disease (27.8%)."[2]  "[M]oderate to severe

asthma" places a person at an elevated risk if they contract the virus.[3]  The CDC reports that

"[a]t the present time, we have no specific information about the risk of COVID-19 in people

with HIV."[4]  The Court concludes that Woodson, at age 57 and with the above-described

---

[2] Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 — COVID-NET, 14 States, March 1–30, 2020, CDC (Apr. 17, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm (accessed May 2, 2020).
[3] People Who Are at Higher Risk for Severe Illness, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (accessed May 2, 2020).
[4] What to Know About HIV and COVID-19, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/hiv.html (accessed May 2, 2020).

conditions, is at elevated risk of serious illness or death if he were to be infected by the COVID-19 virus.

The parties hotly dispute whether the MCC has adequately protected inmates against COVID-19 infection, a matter that is the subject of litigation in this District.  Fernandez-Rodriguez et al. v. Licon-Vitale, No. 20 cv 3315 (ER).  The Court heard argument from counsel and has received regular briefings on the precautions taken by the MCC and the perceived shortcomings of those precautions.  Complaints by inmates include inadequate COVID-19 testing, insufficient face masks, soap and fresh clothing, inadequate quarantining and inmate separation, failure to process medical requests in a timely fashion and generally unsafe and unsanitary conditions.  Six inmates at the MCC have tested positive for COVID-19, which is about 1% of the inmate population of nearly 700.  Woodson's counsel correctly points out that testing has been limited to individuals with symptoms of the disease and therefore there may be asymptomatic, infected inmates who are capable of infecting others.  At this stage of the pandemic, testing in New York City is not generally available to persons who have no symptoms of the disease and so the number of infected but asymptomatic residents is not reliably known.

For purposes of this motion, the Court assumes that there are risks from the virus to a person, with underlying medical conditions similar to Woodson, at liberty in Manhattan and also to a person incarcerated at the MCC but that a person at liberty has (a) a significantly greater ability to minimize risks by distancing himself, utilizing personal protective equipment of his choice, and restricting contact with others; and (b) better and quicker access to medical treatment in the event he experiences symptoms.  Put another way, the Court assumes that Woodson, as an inmate at the MCC, a 700-inmate, high-rise facility in lower Manhattan, is at greater risk of exposure to the virus than he would be if he were at liberty or on home confinement.

But there are a host of relevant section 3553(a) factors that make Woodson a poor candidate for sentence reduction.  His medical conditions and the progress he made in addressing his crack addiction were important reasons for his below-Guidelines sentence.  (Doc 41 at 8-9.)  As of May 4, 2020, he will have served 89 days of his 366-day sentence, which, with good-time credit, should be a 311-day sentence.  By any measure, he has served less than 30% of his sentence.

His crime is richly deserving of just punishment.  For a seven-year period, Woodson obtained extra and unneeded prescriptions for his HIV medications which he then resold on the black market.  This was not a one-time error in judgment but a way of life that required effort, planning, and ingenuity.  He was questioned by agents in 2016 but continued to engage in the course of conduct.  (Doc 41 at 6.)  The PSR reported that during the period 2011 to 2018, Woodson obtained approximately 537 prescriptions for various HIV drugs and was associated with at least 16 different Medicare Part D plans.  He made between three and five plan changes per year.  (PSR ¶ 16.)  Woodson used at least 40 different doctors and at least 34 different pharmacies.  (Id. ¶ 17.)  On more than 40 occasions, he also obtained HIV medications from the VA.  (Id. ¶ 20.)  When questioned by law enforcement agents in August 2016, Woodson stated that he sold the Medicare HIV medications on the black market and also received "kickbacks" from pharmacies, yet his criminal conduct continued for nearly two years after the interview.[5]  (Id. ¶ 22.)  Restitution of $815,502.39 is unlikely to be paid.

The crime repeatedly and needlessly taxed the resources of medical providers, pharmacists, and plan administrators.  It placed those in need of HIV medications in danger because the medications they received may have been sold to them beyond the original

---

[5] There were no objections to the facts set forth in the PSR which were adopted as the Court's findings of fact.  (Doc 41 at 3.)

expiration date or stored under inappropriate conditions that impaired the integrity of the drug.[6] In the context of this ongoing pandemic, the defendant poses a significant danger to the community because of the risk that he would resort to criminal conduct of the type in which he engaged from 2011 to 2018.  This would divert scarce medical resources at a time of particularly great need for those resources.

Supervising Woodson on home confinement with location monitoring would greatly tax the resources of the Office of Probation because it would require an officer to distinguish between needed in-person, telephonic, or virtual medical visits and pharmaceutical orders and those that might reflect a resumption of the pattern of criminal deception.  Neither the BOP nor the Office of Probation is in a position to serve as an intermediary in the on-going dispensing of pharmaceuticals, beyond an initial 30-day supply.

CONCLUSION

Defendant's seven-year criminal activity came to end upon his arrest less than two years ago.  Fewer than ninety days after surrendering to serve a well-considered below-Guidelines sentence that took account of his medical conditions but not the COVID-19 pandemic, Woodson seeks a sentencing reduction.  Considering Woodson's medical conditions, the conditions at the MCC during the pandemic, the nature and circumstances of the crime, his history and characteristics, the other section 3553(a) factors, and the danger to the community

---

[6] At sentencing, the government outlined the danger of Woodson's conduct to others: "Mr. Woodson acknowledges selling these drugs to pharmacies, and what the pharmacies do with these drugs is they remove the labels from them, they put on new fake [labels], and they sell them to unsuspecting customers. They buy them at a cut rate or below wholesale acquisition cost price, and then they resell them in the regular market, and regular patients who need these drugs buy them, consume them, and they have no idea whether those drugs have expired. Often times they have been locked in an automobile, or flown on an airplane, or kept in other unsafe conditions, which renders the drugs potentially useless at best, and potentially the worst case scenario would be it causes some change in the drug that could be detrimental to the health of the patient, or in the process of switching the labels sometimes the drugs get confused. So, there is a high risk to that community. . . ."  (Doc 41 at 6-7.).

that he would pose if he were at liberty, the Court concludes that there are not "extraordinary and compelling" reasons to reduce Woodson's sentence. His renewed motion is therefore DENIED. The Clerk is directed to terminate the motion (Doc 58).


        SO ORDERED.


                                          P. Kevin Castel
                                  United States District Judge


        Dated: New York, New York
               May 4, 2020